IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-232

No. COA20-879

Filed 1 June 2021

Alamance County, No. 18 JA 175

IN THE MATTER OF: K.M.

Appeal by respondent-mother from order entered 20 August 2020 by Judge
Fred Wilkins in Alamance County District Court. Heard in the Court of Appeals 27
April 2021.

> *Jamie L. Hamlett for petitioner-appellee Alamance County Department of
> Social Services.*
>
> *Administrative Office of the Courts, by GAL Appellate Counsel Matthew D.
> Wunsche, for guardian ad litem.*
>
> *J. Thomas Diepenbrock for respondent-appellant mother.*

ZACHARY, Judge.

¶ 1    Respondent-Mother appeals from the trial court's order awarding her
supervised visitation with her son "Kenneth,"[1] but temporarily suspending in-person
visitation due to the closure of the supervised visitation facilities during the COVID-
19 pandemic. After careful review, we affirm the trial court's order in part, vacate the

---

[1] Consistent with the parties' stipulation and the record on appeal, a pseudonym is
used to protect the identity of the juvenile in accordance with N.C.R. App. P. 42(b).

order in part, and remand.

## *Background*

Kenneth was born to Respondent-Parents in February 2018. The day after Kenneth was born, the Alamance County Department of Social Services ("DSS") received a report that both Kenneth and Respondent-Mother had tested positive for marijuana. On 25 September 2018, DSS received a report concerning domestic violence between Respondent-Parents and the maternal grandmother; Respondent-Mother was arrested for allegedly assaulting her mother in Kenneth's presence. On 8 October 2018, DSS received another report, this time regarding substance abuse, improper supervision, improper care, and domestic violence. Respondent-Parents and the maternal grandmother allegedly consumed marijuana while Kenneth was present in the home, and when a social worker and law enforcement officers visited the home to investigate, Respondent-Mother locked herself in a bedroom with Kenneth and threatened to kill herself. When law enforcement officers intervened, Respondent-Mother "engaged in a physical altercation with them." Respondent-Mother was involuntarily committed, and Kenneth was placed in a kinship placement with a maternal relative.

On 12 October 2018, DSS filed a juvenile petition alleging that Kenneth was a neglected and dependent juvenile. That same day, the trial court entered an order placing Kenneth in nonsecure custody with DSS. DSS, in turn, placed Kenneth with

a foster family ("the guardians"), rather than continuing the kinship placement, because the maternal relative stated that she could no longer care for Kenneth. Following a Child and Family Team meeting on 8 November 2018, Respondent-Parents agreed to case plans. And on 12 December 2018, Respondent-Parents stipulated to certain facts for the purposes of adjudication in this matter, including that "it would place [Kenneth] at a substantial risk of physical harm if returned to [Respondent-Parents] due to their ongoing mental health, substance abuse, domestic violence, lack of ability to provide basic needs and other issues of concern."

¶ 4 On 30 December 2018, Respondent-Mother was arrested and charged with the misdemeanor simple assault of Respondent-Father. While incarcerated, she was charged with felony possession of a controlled substance on jail premises. She remained incarcerated until 24 January 2019.

¶ 5 On 6 January 2019, the trial court entered an order adjudicating Kenneth to be a neglected and dependent juvenile, and awarding custody of Kenneth to DSS. The trial court also set conditions for Kenneth's reunification with Respondent-Parents, and awarded Respondent-Parents supervised visitation.

¶ 6 Respondent-Father was arrested on 18 March 2019 for a variety of drug possession charges, contributing to the delinquency of a minor, and a probation violation. Respondent-Father was also charged with second-degree sexual exploitation of a minor and contributing to the delinquency of a minor, allegations

concerning his 17-year-old girlfriend who lived with him. He was incarcerated until 22 June 2019, when he was released on post-release supervision and subject to house-arrest.

¶ 7    Following an initial permanency planning hearing on 9 April 2019, the trial court endorsed reunification with Respondent-Parents as a primary plan for Kenneth with adoption as a secondary plan, but maintained Kenneth's placement with DSS and continued Respondent-Parents' conditions for reunification.

¶ 8    On 15 May 2019, Respondent-Mother was arrested for a probation violation. On 18 July 2019, she was arrested for shoplifting and concealment of goods. Despite this, she consistently attended her supervised visits with Kenneth when she was not incarcerated.

¶ 9    On 6 August 2019, after Respondent-Mother failed to confirm that she would attend a visitation with the social worker, the social worker informed Respondent-Mother that the visitation would be canceled. Respondent-Mother texted the social worker an apology, but when she called the social worker, Respondent-Mother "began screaming obscenities at [the social worker,] calling her names such as stupid, fat, and bitch." The social worker ended the call as Respondent-Mother "continued to use profanity and was beyond reasoning with as she was screaming childlike into the phone." Respondent-Mother called back and after the social worker restated the confirmation process for supervised visitation, Respondent-Mother "again began

shouting and screaming profanity, calling [the social worker] a f***ing idiot and a f***ing bitch."

¶ 10 Respondent-Mother was arrested again on 13 August 2019, for a variety of drug possession charges, and missed her next supervised visitation due to her being incarcerated. On 9 September 2019, Respondent-Mother was again arrested, this time for injury to personal property, and remained incarcerated until 13 January 2020.

¶ 11 In the four permanency planning orders filed between June 2019 and February 2020, the trial court repeatedly found that Respondent-Mother was "somewhat actively participating" in her case plan, but noted that she was "not making adequate progress within a reasonable period of time[.]" In the February 2020 order, the trial court found that Respondent-Father was making adequate progress and conditionally allowed him to have unsupervised visitation with Kenneth. However, after Respondent-Father tested positive for marijuana on 28 February 2020, the social worker was no longer able to say that his home was free of drugs, and Respondent-Father was reverted to supervised visitation only.

¶ 12 On 16 March 2020, the Chief Justice of the Supreme Court of North Carolina issued an order directing that the majority of district court cases, including this case, be continued for 30 days due to the emerging public health threat posed by the COVID-19 pandemic. The order was then extended to 1 June 2020, and hearings in

this case were continued.

¶ 13    On 20 March 2020, the North Carolina Department of Health and Human Services directed the State's Child Protective Services units to "make all efforts to cease face-to-face visitation for foster children . . . and [to] transition to electronic means." Respondent-Parents agreed to suspend in-person visitation and engage in electronic visitation in the event that the county or state facilities went into lockdown due to the pandemic. Before the first scheduled visitation, Guilford County issued a stay-at-home order. Respondent-Parents began virtual visits with Kenneth on 28 March 2020. In-person visitation with Kenneth resumed on 21 May 2020 for Respondent-Mother and on 2 June 2020 for Respondent-Father.

¶ 14    The matter came on for hearing before the Honorable Fred Wilkins in Alamance County District Court on 22 and 23 July 2020. In an order entered 20 August 2020, the trial court ordered, *inter alia*, that Respondent-Mother exercise her visitation with Kenneth at a supervised visitation facility, but temporarily suspended that in-person visitation due to the closure of the supervised visitation facilities as a result of the COVID-19 pandemic:

> 6. That [Respondent-Mother] will have monthly visitation with [Kenneth] through the Family Abuse Services supervised visitation program or another supervised visitation program in the Triad that has similar cost structure and reasonable driving distance. The visitation shall be twice a month for two hours. [Respondent-Mother] will contact Family Abuse Services in order to set up an

intake meeting or a different supervised visitation program in the Triad if Family Abuse Services remains closed that has similar cost structure and reasonable driving distance. The day and time will be based on the availability of the program. . . .

. . . .

8. Until the Family Abuse Services supervised visitation center re-opens or another supervised visitation program is found, [Respondent-Mother]'s face-to-face visitation is suspended. [Respondent-Mother] is permitted to have a weekly video contact with [Kenneth] for fifteen to thirty minutes as [Kenneth]'s attention span will allow, supervised by the Guardians.

In the Family Abuse Services supervised visitation program order, the trial court added that Respondent-Mother's "level of supervision shall include eyes and ears on, direct supervision."

¶ 15        Although the trial court stated at the hearing that the guardians would bear the responsibility of paying the costs of supervised visitation, neither the permanency planning order, the guardianship short order, nor the Family Abuse Services supervised visitation program order—all entered on 20 August 2020—specifically addressed the assignment of the cost of the supervised visitation facility. On 18 September 2020, Respondent-Mother timely filed her notice of appeal from the permanency planning order.

## Discussion

¶ 16        On appeal, Respondent-Mother argues that the trial court erred by (1)

suspending her supervised visitation with Kenneth, and (2) failing to assign the cost of supervised visitation to the guardians. After careful review, we affirm that portion of the trial court's order temporarily suspending the supervised visitation. However, we vacate the portion of the order relating to payment of the supervised visitation facility fee, and remand to the trial court for clarification.

## I. *Standard of Review*

Our review of a permanency planning order is "limited to whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law. The trial court's findings of fact are conclusive on appeal when supported by any competent evidence, even if the evidence could sustain contrary findings." *In re J.S.*, 250 N.C. App. 370, 372, 792 S.E.2d 861, 863 (2016) (citation omitted). Unchallenged findings of fact are presumed to be supported by competent evidence and are thus binding on appeal. *In re S.C.R.*, 198 N.C. App. 525, 532, 679 S.E.2d 905, 909, *appeal dismissed*, 363 N.C. 654, 686 S.E.2d 676 (2009).

"We review a dispositional order only for abuse of discretion. An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *In re N.K.*, ___ N.C. App. ___, ___, 851 S.E.2d 389, 394 (2020) (citation omitted).

## II. *Suspension of Supervised Visitation*

Respondent-Mother argues that the trial court erred when it suspended her

supervised visitation with Kenneth, because that suspension "effectively eliminate[d] the very visitation the trial court ordered." Respondent-Mother further contends that "[t]he trial court's conclusion that it [wa]s contrary to Kenneth's best interest to have face-to-face visitation [wa]s not supported by the trial court's findings of fact or by competent evidence."

¶ 20    Our Juvenile Code provides:

> An order that removes custody of a juvenile from a parent, guardian, or custodian or that continues the juvenile's placement outside the home shall provide for visitation that is in the best interests of the juvenile consistent with the juvenile's health and safety, including no visitation. The court may specify in the order conditions under which visitation may be suspended.

N.C. Gen. Stat. § 7B-905.1(a) (2019). When a trial court places a juvenile in a guardianship, "any order providing for visitation shall specify the minimum frequency and length of the visits and whether the visits shall be supervised." *Id.* § 7B-905.1(c).

¶ 21    In the instant case, Respondent-Mother does not challenge any of the trial court's findings of fact. Instead, Respondent-Mother challenges conclusion of law #19 and the decretal portions of the order that awarded her with, but then temporarily suspended, visitation at a supervised visitation facility. Respondent-Mother argues that "[t]he trial court erred when it suspended [her] visitation with her son, when she had not forfeited her rights to visitation, and when the evidence [did] not support a

finding that it was contrary to Kenneth's best interest to have visitation with his mother."

¶ 22        Conclusion of law #19 reads as follows, with the specific portion that Respondent-Mother challenges in italics:

> 19. That *until Family Abuse Services supervised visitation center is operating or another supervised visitation facility in the Triad is operating that has similar cost structure and reasonable driving distance, it is contrary to the best interest of* [*Kenneth*] *to have face-to-face visitation with* [*Respondent-Mother*]. Until the centers re-open, [Respondent-Mother]'s face-to-face visitation is suspended. [Respondent-Mother] is permitted to have a weekly video contact with [Kenneth] for fifteen to thirty minutes as [Kenneth]'s attention span will allow, supervised by the Guardians.

¶ 23        The challenged conclusion of law—that face-to-face visitation with Respondent-Mother was not in Kenneth's best interests so long as no appropriate supervised visitation facility was open and operating during the COVID-19 pandemic—is necessarily understood in the full context of the trial court's order, and builds upon two independent determinations: (1) that only a specific, narrowly defined supervised visitation with Respondent-Mother would be in Kenneth's best interests; and (2) that the COVID-19 pandemic rendered that specific supervised visitation temporarily unavailable.

¶ 24        The trial court explained the first determination in the immediately preceding conclusions of law, which Respondent-Mother does not challenge:

17. That due to [Respondent-Mother]'s volatile and uncontrolled temper, inability to comply with the terms and conditions of court orders and other issues as outlined above, *it is contrary to the best interest of [Kenneth], inconsistent with the health and safety of [Kenneth] and would present a risk of harm to [Kenneth]:*

    a. *To have unsupervised visitation with [Kenneth];*

    b. *To have visitation supervised by [the maternal grandmother];*

    c. *To have visitation supervised by the [guardians]; and*

    d. *To have visitation supervised by anyone who is not trained in supervision techniques and strategies.*

18. That [Respondent-Mother] will have visitation supervised by Family Abuse Services supervised visitation center or another supervised visitation program in the Triad that has similar cost structure and reasonable driving distance.

(Emphasis added).

¶ 25 These unchallenged conclusions of law are supported by the trial court's unchallenged finding of fact "[t]hat it would present a risk of harm for the [guardians], maternal grandmother or any untrained person to supervise [Respondent-Mother]'s visitation due to [her] volatile and uncontrolled behaviors and her aversion to individuals who present information/direction contrary to [her] desire." Not only does Respondent-Mother not challenge this finding of fact, but our careful review of the record reveals significant support for the trial court's finding. In light of Respondent-Mother's criminal history and her pattern of abusive behavior

and hostility toward her assigned social worker, it is apparent that the trial court plainly considered—and rejected—alternative forms of visitation and specifically concluded that Kenneth's best interests would be best served by limiting Respondent-Mother to visitation at a supervised visitation facility.

¶ 26    The second determination—that the COVID-19 pandemic rendered that narrowly defined supervised visitation temporarily unavailable—is supported by the trial court's unchallenged findings of fact. Among these binding findings of fact are several that address the effect of the COVID-19 pandemic on Respondent-Mother's visitation with Kenneth:

> 76. [Respondent-Mother] participated in her weekly visitation from January 14, 2020 — March 17, 2020. *All parties agreed to temporarily suspend face to face visits due to COVID*[-]*19*. These visits took place at [DSS] or a mutually agreed upon location such as McDonald's. These visits went well. . . .
>
>        . . . .
>
> 102. *Due to the* [*COVID*]-*19 Pandemic, in an effort to protect the safety and health of the child in this case, a temporary and limited change to the visitation has been agreed to.* In this case, all parties agree to supervised visits on the weekend by the [guardians] at the same level of supervision. *In the event that all public locations close or the state/county goes into lockdown mode,* [*Respondent-Mother*] *and* [*Respondent-Father*] *agree to suspend their face-to-face contact and engage in electronic means*. These would be arranged by the parties. [Respondent-Parents] have been advised that they should also consult their attorneys in this matter. *Prior to the first supervised face-*

*to-face visit by the* [*guardians*]*, Guilford County issued a stay at home order.* [*Respondent-Parents*] *began virtual visits with* [*Kenneth*] *on March 28, 2020.*

103. The [guardians] reported that the virtual visits were a challenge. They were a challenge because it was sometimes difficult to get [Kenneth] to get on the phone as he is two and his attention span is not very long. The other challenge that they faced was when [Respondent-Parents] were not ready for the visits. For example, they would call [Respondent-Mother] and she would be asleep and would ask if she could get up and get it together and call them back. There were times that [Respondent-Father] would not answer and would call back an hour or so later. The [guardians] found that driving [Kenneth] around in the car while he spoke with [Respondent-Parents] was the best way to get him to focus on them.

104. The face-to-face visits began again on May 21, 2020 for [Respondent-Mother] and June 2, 2020 for [Respondent-Father]. The visits have gone well.

. . . .

121. Family Abuse Services of Alamance County operates a supervised visitation center *that is not currently operating and no date for re-opening has been set. . . .*

. . . .

125. *That due to the pandemic, the visitation center is not currently conducting visitation and has not stated when it will reopen.*

(Emphases added).

¶ 27    These findings of fact not only support the trial court's conclusions, but also provide necessary context. The parties agreed to temporarily suspend face-to-face

visitation at the onset of the pandemic. Indeed, these initial suspensions proved to be temporary, in that face-to-face visitation resumed after a few months. The limited and temporary nature of the suspension in the order before us is further reflected in the reasonable limitations that the trial court explicitly placed on the suspension: it would last only until the supervised visitation facility reopened, or until the parties located an open and adequate supervised visitation facility in the area.

¶ 28      With the supervised visitation facility temporarily closed due to the COVID-19 pandemic, the trial court was faced with determining whether it was in Kenneth's best interests either to temporarily suspend Respondent-Mother's supervised visitation, or to award Respondent-Mother an alternative form of visitation that the court had already determined was not in Kenneth's best interests. The trial court chose to grant Respondent-Mother the narrowly defined supervised visitation that would be in Kenneth's best interests, and then to *temporarily* suspend that supervised visitation until such visitation became available and safe.

¶ 29      Respondent-Mother cites *In re T.R.T.*, 225 N.C. App. 567, 572–75, 737 S.E.2d 823, 828–29 (2013), in support of her argument that the trial court's suspension of supervised visitation violated N.C. Gen. Stat. § 50-13.2(e), which provides, *inter alia*: "Electronic communication may not be used as a replacement or substitution for custody or visitation." In *T.R.T.*, this Court reversed and remanded a visitation order that provided the respondent-mother with Skype visitation, which we determined

was "not visitation as contemplated by N.C. Gen. Stat. § 7B-905(c)[.]"[2] 225 N.C. App. at 573, 737 S.E.2d at 828. However, unlike the case before us, in *T.R.T.*, "the trial court did not make any specific findings that . . . visitation would be inappropriate under the circumstances." *Id.* at 574, 737 S.E.2d at 829. Here, the trial court *did* make specific findings that visitation would be inappropriate, with the sole exception of supervised visitation at Family Abuse Services, which was temporarily closed due to the COVID-19 pandemic.

¶ 30        Further, the trial court's temporary suspension of supervised visitation in this case does not amount to "a replacement or substitution for . . . visitation." N.C. Gen. Stat. § 50-13.2(e). Rather, the trial court exercised its statutory authority to "specify in the order conditions under which visitation may be suspended." *Id.* § 7B-905.1(a). Indeed, the trial court's order repeatedly describes Respondent-Mother's supervised visitation as "suspended," rather than "replaced" or "substituted" with weekly video contact.

¶ 31        The trial court appropriately provided Respondent-Mother with a contingency, depending on the availability of the specific form of supervised visitation that the court deemed to be in Kenneth's best interests. Having determined that other forms

_____

[2] Our General Assembly repealed the relevant portion of § 7B-905(c) in 2013 and substantively recodified it as § 7B-905.1(a). 2013 N.C. Sess. Laws 305, 316, ch. 129, §§ 23–24.

of visitation were not in Kenneth's best interests, and having determined that the sole form of appropriate visitation was temporarily unavailable, the trial court could have properly awarded Respondent-Mother with "no visitation" at all. *Id.* However, in its discretion, the trial court concluded that it was preferable to temporarily award Respondent-Mother weekly video contact for so long as in-person visitation was unavailable due to the pandemic.

¶ 32     The trial court's reasoning is further reflected in the transcript of the hearing. First, the trial court modified DSS's recommended visitation order, with respect to ensuring Respondent-Mother's sobriety:

> THE COURT: The Court's inclined to go along with the recommendations of the department in this matter, but I do think that the visitation schedule needs to be modified a little bit, particularly with respect to [Respondent-Mother].
>
> I don't think that the foster parents in the role of guardians should be put to the task each visit to determine her sobriety or her mental state on this, and from all the evidence that I have heard here over the last two days, it needs someone else that's more acutely attuned to making those types of decisions should do it.
>
> And I don't think it should be a matter of concern. I think it should be: if she appears under the influence of alcohol or mind-altering drug[s] or if she appears in an agitated state for the visitation, that the visitation is terminated, and I think that should be done by a third party, not by the guardians because, eventually, that is or will come back in court.
>
>           . . . .

So the visitation schedule is set by [DSS] on this will be modified on this to not include[ ] the terms "concern" but would be "appear at a visit."

And those visits with respect to [Respondent-Mother]—I can't remember the name of the facility here.

[COUNSEL FOR DSS]: Your Honor, the supervised visitation is done through the Family Abuse Services at the Family Justice Center. Right now, due to COVID[-19], they are not operating or conducting visits, and I don't know when they will start back.

THE COURT: That's that way it needs to be done.

Then, after addressing assessment of the supervised visitation facility fee, Respondent-Mother's counsel objected to the visitation order. As described below, the trial court considered—and rejected—the alternative option of awarding Respondent-Mother supervised visitation at DSS:

[RESPONDENT-MOTHER'S COUNSEL]: And, Your Honor, I would like to just put my objection on the record.

THE COURT: I understand. I understand.

[RESPONDENT-MOTHER'S COUNSEL]: That, number one, my client [lives] an hour away from Family Abuse Services, but Family Abuse Services has suspended all their supervised visitation. They do not have a plan of when they're going to start it back up, and it has not started back up, so it's not a viable option.

THE COURT: Well, then—then the alternative is to have those visitations occur at DSS and be monitored by them, but *I don't want the guardians being placed in the position of having to deal with this lady under those*

> *conditions. I think that's—I think that's dangerous to all the parties and the child.*

(Emphasis added).

Respondent-Mother characterizes this exchange as a recognition by the trial court that there existed "an alternative to suspending visitation while FAS was closed[.]" That argument, however, ignores that the trial court clearly considered that option and nevertheless rejected it, determining that having Respondent-Mother's visitation supervised at DSS would not be "in the best interests of [Kenneth] consistent with [his] health and safety[.]" *Id.*

After careful review of the record, and due to the specific circumstances at the time, we cannot say that the trial court's decision was not supported by its findings of fact or conclusions of law, nor can we say that it was "so arbitrary that it could not have been the result of a reasoned decision." *N.K.*, ___ N.C. App. at ___, 851 S.E.2d at 394. The trial court's award and temporary suspension of Respondent-Mother's supervised visitation with Kenneth is affirmed.

### III.   *Costs of Supervised Visitation*

Respondent-Mother next argues, and DSS and the guardian *ad litem* agree, that the trial court erred when it failed to order that the guardians be responsible for the supervised visitation facility fee, as the court indicated at the conclusion of the hearing.

¶ 37   In the trial court's written order, the court determined that it could not "find that [Respondent-Mother] has the ability to pay the fees associated with the center[,]" and that the guardians "have the ability to pay the fees associated with supervised visitation." However, although the trial court clearly indicated at the hearing that the guardians would bear the costs of the supervised visitation facility, the court failed to assign the costs in the order that it ultimately entered.

¶ 38   We have vacated and remanded permanency planning orders when "the trial court made no findings as to the costs associated with supervised visitation, who would bear the responsibility of paying such costs, or [the r]espondent's ability to pay the costs." *In re J.T.S.*, 268 N.C. App. 61, 74, 834 S.E.2d 637, 646 (2019); *accord In re Y.I.*, 262 N.C. App. 575, 582, 822 S.E.2d 501, 505–06 (2018).

¶ 39   Here, the trial court erred by failing to assign responsibility for the costs of supervised visitation in its order. Accordingly, "we vacate this portion of the order and remand to the trial court for clear instructions" with regard to the assessment of the supervised visitation costs. *J.T.S.*, 268 N.C. App. at 75, 834 S.E.2d at 647.

### *Conclusion*

¶ 40   For the foregoing reasons, the trial court did not abuse its discretion in awarding, then temporarily suspending, Respondent-Mother's visitation at a supervised visitation facility that was temporarily closed due to the COVID-19 pandemic. However, the order is vacated and remanded for the entry of an order

assigning responsibility for the costs of the supervised visitation.

AFFIRMED IN PART; VACATED IN PART AND REMANDED.

Chief Judge STROUD and Judge TYSON concur.